1

```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

UNITED STATES OF AMERICA       .    Criminal No. 1:12cr35
                               .
        vs.                    .    Alexandria, Virginia
                               .    June 22, 2012
JESSE CURTIS MORTON,           .    9:48 a.m.
a/k/a Younus Abdullah          .
Mohammad,                      .
                               .
            Defendant.         .    EXCERPT
                               .
. . . . . . . . . . .
```

                    TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE LIAM O'GRADY
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:            GORDON D. KROMBERG, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               JOHN T. GIBBS, ESQ.
                               Counterterrorism Section
                               Criminal Division
                               United States Department of
                               Justice
                               950 Pennsylvania Avenue, N.W.
                               Washington, D.C. 20530


FOR THE DEFENDANT:             JAMES W. HUNDLEY, ESQ.
                               Briglia Hundley Nutall &
                               Kay, P.C.
                               1921 Gallows Road, Suite 750
                               Vienna, VA 22182


ALSO PRESENT:                  SA SCOTT M. McGUCKIN

OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Fifth Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595


            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                        P R O C E E D I N G S

2                      (Defendant present.)

3           *         *         *         *         *

4           THE COURT:  All right, Mr. Morton, please come to the

5    podium.  This is your opportunity to tell me anything you'd

6    like to before I sentence you, and please remain at the podium

7    when you're done.

8           THE DEFENDANT:  Thank you, Your Honor.  I'll just

9    read a statement for a few minutes.

10          THE COURT:  Certainly.

11          THE DEFENDANT:  There's so much that I would really

12   like to say to you today.  I do feel that much of what has been

13   offered about me paints a one-sided and decontextualized

14   perspective, and I actually wish that we could have an

15   opportunity to conversate about some of the specifics,

16   especially those that were mentioned in the courtroom here and

17   that have placed me in front of you, but nevertheless, I know

18   that you realize how important this day is and your sentencing

19   me is for the rest of my life, and so I just want to spend five

20   minutes or so talking a bit about who I was, who I am, and

21   where I'm going, and I thank you greatly for that opportunity.

22          A person's early experiences certainly shape his

23   personality and outlook, and my development was unfortunately

24   plagued by severe physical, emotional, and spiritual abuse.

25   Every day I was choked, bit, scratched, punched, pulled, and

1  perhaps worst of all, insulted.  I became the scapegoat or

2  black sheep of a dysfunctional family, and I tell you this not

3  because I want you to pity me but because it greatly influenced

4  the person that I became.

5       In the home, I adopted the position of savior,

6  seeking to protect my younger siblings.  I cannot tell you how

7  many days I was beaten before school and then would have to

8  wipe the spit from my sister's hair, fix her torn-up homework,

9  and counsel her before she entered her classroom.

10       Early on I became an individual deeply concerned with

11  justice for others, but unfortunately, in many ways I was

12  unable to care enough about my own well-being.  The abuse

13  continued, and no one intervened.  I began to distrust power

14  and authority as the scars left upon my soul led me to question

15  the value of the society around me.

16       In my teenage years, I got involved with marijuana,

17  seeking an escape from my insecurities, and I was lost in a

18  search for an external truth in idealisms, imagining that

19  somewhere out there there was a Utopia or something I could

20  discover.  I continued to provide for others, even when it

21  meant neglecting myself.  I engaged in harmful and

22  dysfunctional relationships, progressed from marijuana to other

23  drugs, and ultimately ended up in jail, where I began a sort of

24  transformation.

25       I had always neglected organized religion until I

1  found Islam.  I was amazed by its compatibility with modern

2  science.  Like all monotheistic traditions, it had a foundation

3  in social justice but also a very polarizing outlook, an

4  us-versus-them, good-versus-evil perspective that satisfied my

5  distrust of authority and a bifurcated view of humanity that

6  allowed me to explain and express my discontent with the

7  external reality.

8          I immersed myself in my newfound religion.  My faith

9  helped me stop drinking and smoking and to get away from old

10  people, places, and things as I started a new life.  I went

11  from a homeless shelter in Harlem, New York, to study on

12  scholarship for my bachelor's degree.  I attained accreditation

13  in substance abuse counseling; started a 501(c)(3) nonprofit to

14  help New York City's homeless; secured employment, housing, a

15  wife; and ultimately was accepted into a prestigious master's

16  degree program at Columbia University.

17          However, today I realize that my alteration was not

18  complete, and Islam may have helped to heal the outward

19  manifestations of my historic traumas, but it also provided a

20  means by which the underlying symptoms of neglect, fear,

21  distrust, and anger remained powerful.

22          These were the early years of the war on terror, and

23  I was passionate about the conflict.  I put my energies once

24  again into defending those far away, when I could have done a

25  great deal to promote peace and dispel myths amongst those

1    around me.  I became active propagating a politicized and

2    revolutionary interpretation of Islam.  I started the Web site,

3    and I espoused the Manichean world view that eventually

4    culminated in the events for which I have been prosecuted.

5           I offer no excuses for what the Web site became, but

6    I do ask you to consider that I was a tool in a greater game.

7    The space was used by others to convey shallow views.  I sought

8    a more intellectual and nuanced approach.  I thought I was

9    acting under the protections of the First Amendment, and I

10   honestly never intended violence.

11          At the time I was indicted, I had altered the content

12   and scope of the Web site.  I was living and working in Morocco

13   with a U.S. nonprofit that promotes U.S. engagement in the

14   Middle East.  I had secured a professorship, recently had my

15   second son, and was preparing to fly to Kuala Lumpur in June to

16   present an academic paper about the economic ramifications of

17   the Arab Spring.

18          I accept full responsibility for sabotaging these

19   efforts, but I mention them here hoping that you consider I may

20   be an asset in promoting peace once I am free.  I have been

21   incarcerated for over a year now, and I can honestly stand

22   before you and say that despite this predicament, I try hard to

23   turn my negative circumstances into positives.

24          I have thought deeply about the extreme views I held,

25   and rather than place blame on authorities, law enforcement,

1   government, or conspiracy theories, I realize that I was wrong.

2   I remain critical of the contemporary wars and oppressions

3   throughout the world but realize that the means I selected to

4   address them only contributed to the perpetuation of conflict.

5   The world is just not at all black and white.

6           I still relish the passion that runs through my soul,

7   but I realize that I tend to run my head into walls that cannot

8   be moved while failing to address the things around me that I

9   actually have an ability to influence.  Life is a process of

10  constant change, and I accept the responsibility for my

11  choices.

12          I have been open and honest about my altered

13  perceptions with my family and loved ones.  I have communicated

14  in ways that express an altered view to those that read my Web

15  site.  I continue to participate enthusiastically and honestly

16  during the debriefing process, and I can honestly tell you that

17  I have reformed and that were you to let me go today, I would

18  work diligently and with similar passion to correct the

19  mistakes I have made.

20          Ultimately, my efforts were self-defeating.  I

21  contributed to a clash of civilizations when my background

22  would have been better used to promote dialogue and

23  collaboration.  My idealisms led me to violate the religion I

24  claimed to love so much.  The Koran commands us to stand for

25  justice even if it is against our own selves and to repel

1  injustice with what is better.  Instead, I overlooked the

2  faults of my fellow Muslims but was harsh and judgmental with

3  others.  I failed to denounce extreme views even when I knew

4  they were incorrect, and I justified atrocities simply because

5  they were carried out by the weak against the powerful, a

6  variable that does not endow any moral justification

7  whatsoever.

8          In turn, I betrayed my country, my community, my

9  principles, my religion, and myself, but the most significant

10 betrayal came at the expense of my family.  My wife now must

11 care for two children on her own, and one of them has Down's

12 Syndrome.  I have gone without seeing them take their first

13 steps.  I will not hear their first words.  I may not see them

14 off to their first day of school.

15         While I value my intelligence and passion, I realize

16 today that I must channel it towards those that deserve my love

17 and dedication.  I remain hopeful that some day I will be

18 reunited with them.

19         I believe everything happens for a reason, and I

20 understand now that a true idealist must first and foremost

21 refrain from black-and-white perspectives, primarily because

22 they tend to twist compassionate intentions for good into

23 polarized justifications for the perpetuation of conflict.

24         Rather than rely on the principles through which

25 ideals were born, such views stand upon close-minded and

1    intolerant straw men that can never bring about conditions for

2    peace.  I ask you to consider that I have truly altered my

3    perspective.

4            Finally, in determining criminal punishment, the most

5    important factors to consider are an offender's culpability,

6    the resulting harms, and the prospect of deterring future

7    crimes.  I ask you to consider the variables alluded to in the

8    sentencing memorandum, the limited harms that have arisen, and

9    the fact that I can help deter future crimes if given the

10   opportunity to utilize my education and experiences in ways

11   that are socially productive.

12           Ultimately, I humbly request as much leniency as

13   possible and am extremely grateful for your giving me time to

14   make this statement.  Thank you.

15           THE COURT:  Where are you today on your belief that

16   anyone who offends Muhammad must die, as taught in the Koran?

17           THE DEFENDANT:  It's actually not even taught in the

18   Koran.  It's not mentioned in the Koran at all, that

19   perspective.  The perspective that was covered in detail in the

20   clarification statement is the statement by a consensus of

21   scholarship from historical tradition, but the -- that

22   understanding leaves out a lot of variables, and that's a very

23   long conversation, but for example, there's a very famous

24   video -- or audio, "The Dust Will Never Settle Down," in which

25   Anwar al Awlaki takes a very old, thousand-year-old fatwa from

1    a classical Islamic scholar by the name of Ibn Taymiyyah, but

2    he makes analogy where it's inappropriate, he falsifies

3    documents, misinterprets what's called the hadith, which is the

4    corpus of texts apart from the Koran, and so it's actually an

5    incorrect statement.

6           What the, what the, what the authors of *South Park*

7    did, to compare that to what occurred when a person was

8    assassinated during the lifetime of the Prophet Muhammad and to

9    compare that and to make that analogy is an incorrect analogy,

10   and it's a deliberate misinterpretation of the religion, and so

11   by my publishing that, that opinion, I should have added a

12   caveat, and I knew that it was very ludicrous in comparison to

13   what these people did.  Having seen the cartoon myself, I knew.

14          So even back then, I didn't agree, but even now, even

15   more so, so I vehemently oppose such a view.  I think if

16   anything, we need to talk about conversations about Muhammad

17   and his role in Islam, and we need to promote more dialogue,

18   and as Mr. Kromberg alluded to, by approaching the subject the

19   way that I did, I shut off all opportunity for dialogue, a

20   completely close-minded and idiotic stance, and I regret that I

21   did it.

22          THE COURT:  Okay.  Well, thank you.  You're such a

23   bright, potentially positive influence in the Muslim world, and

24   you took such a horrible turn because of idealism, because of

25   your passion, and because of your anger, and you endangered the

1    lives of a great number of people, and, you know, you did that

2    intentionally, and you -- as much as people used you, you used

3    them, and you were, you know, rubbing elbows with some of the

4    most powerful and most dangerous revolutionaries in the past

5    years, who were espousing very violent acts, and, you know,

6    making victims available to those who would, who would

7    perpetrate the acts themselves, and whether by bomb or by knife

8    or by whatever means that they chose, and so the need to deter

9    you is clear, and the need to deter others from taking up your

10   causes like this in this way is, is so prominent in the

11   sentencing guidelines.

12          I am very hopeful that you now understand that, you

13   know, there has to be religious tolerance in the world, and

14   there has to be freedom of speech, and that people have to have

15   the confidence that they won't be killed because they oppose

16   Islam or Jesus Christ or God, and that what you did had a

17   terrific chilling effect on freedom of speech, which is what

18   you, you know, I think at one stage believed that, you know,

19   *Revolution Muslim* was all about, projecting freedom of speech

20   to change the dialogue on what was happening in the Muslim

21   world, and I think that was very laudable, but the way that you

22   spun out of control is extraordinarily dangerous to the

23   community here and the communities around the world, and you're

24   not being punished for, you know, some of the comments about

25   the justification for killing of other human beings, but only

1    the call for persons to commit those acts.

2           So a lengthy sentence is necessary for purposes of

3    deterrence for you and of others and for the crime that you

4    committed.  I'm going to sentence you to 60 months of

5    imprisonment on Count 1, 60 months on Count 2, and 18 months on

6    Count 3.  Those sentences will run consecutively.  They will

7    take into consideration the six months that you spent awaiting

8    your extradition to the United States when you were in custody

9    in Morocco.

10          Three-year terms of supervised release as to each of

11   the counts, to run concurrently.  As special conditions of your

12   supervised release, I'll order that you be -- that you comply

13   with the requirements of computer monitoring programs that may

14   be administered by the Probation Office, that I'll impose $300

15   worth of special assessment fees.  I will not impose the costs

16   of incarceration or a fine, believing that you are unable to

17   afford it.

18          I'll make the recommendations we discussed regarding

19   designation of the Bureau of Prisons.

20          Mr. Hundley, I apologize, was there a request for an

21   evaluation for RDAP as well in this case, the residential drug

22   program?

23          MR. HUNDLEY:  Oh, yes, Your Honor.

24          THE COURT:  All right, I'll make that recommendation

25   as well.

12

 1              I'll give you credit for time served in U.S. custody

 2    awaiting sentencing today.

 3              And, you know, I read all of your family's letters.

 4    I am moved by the plight of your wife and children, who are

 5    innocent victims of, of this conduct, but I am very much

 6    hopeful that you will go forward and do what you say you're

 7    going to do, and you have the ability to be a very significant

 8    contributor to your community if you do it the right way, and I

 9    hope that you'll make that choice.

10              THE DEFENDANT:  Thank you.

11              THE COURT:  Anything else this morning?

12              MR. KROMBERG:  No, thank you, Your Honor.

13              MR. HUNDLEY:  No, Your Honor, thank you.

14              THE COURT:  All right, then we're going to take a

15    brief recess.  We'll come back with our civil docket.  We're in

16    recess.

17                          (Which were all the proceedings

18                           had at this time.)

19

20              CERTIFICATE OF THE REPORTER

21       I certify that the foregoing is a correct transcript of

22    the record of proceedings in the above-entitled matter.

23

24

25                          _____
                                      /s/
                                Anneliese J. Thomson