1

V I R G I N I A

     IN THE GENERAL DISTRICT COURT OF FAIRFAX COUNTY

```
- - - - - - - - - - -x
                     :
COMMONWEALTH OF VIRGINIA       :
                     :
   -vs-              :  CASE NO.: GC18006702-00
                     :
JESSE CURTIS MORTON, :
a/k/a YOUNUS ABDULLAH MUHAMMAD,:
                     :
    Defendant.       :
                     :
- - - - - - - - - - -x
```

                     General District Courtroom 1A
                        Fairfax County Courthouse
                            Fairfax, Virginia

                         Tuesday, April 3, 2018

     The above-entitled matter came on to be heard before THE HONORABLE WILLIAM J. MINOR, JR., Judge, in and for the General District Court of Fairfax County, in the Courthouse, Fairfax, Virginia, beginning at 2:56 o'clock p.m.

     APPEARANCES:

          On Behalf of the Commonwealth:

               BRIDGET A. CORRIDON, ESQUIRE
               Assistant Commonwealth's Attorney

          On Behalf of the Defendant:

               JAMES W. HUNDLEY, ESQUIRE

                 * * * * *

2

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOSE TORRES | 5 | 8 | -- | -- |
| OFF. SCOTT D. SHAFER | 14 | 22 | -- | -- |

\* \* \* \* \*

3

1              P R O C E E D I N G S

2              (Whereupon, the Court Reporter was sworn by

3    the Court.)

4              THE COURT:  All right.  Which -- which case is

5    this?

6              MS. CORRIDON:  It's the Jesse Morton case,

7    Your Honor.

8              THE COURT:  Jesse Morton.

9              MR. HUNDLEY:  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.

11             THE DEFENDANT:  Good afternoon.

12             THE COURT:  Good afternoon.  Are there any

13   preliminary matters before we begin?

14             MR. HUNDLEY:  I'd ask for a rule on witnesses,

15   Your Honor.

16             THE COURT:  All right.

17             MS. CORRIDON:  The Commonwealth does have two

18   witnesses, Your Honor.

19             THE COURT:  All right.  Would the witnesses --

20   all to give testi -- all those to give testimony in this

21   matter please rise and raise your right hands?

22             POTENTIAL WITNESSES:  (Complied with the

23   request.)

4

1              (Whereupon, the potential witnesses were duly

2    sworn by the Court.)

3              THE COURT:  All right.  Who's your first

4    witness?

5              MS. CORRIDON:  It's going to be Jose Torres.

6              THE COURT:  Mr. Torres, please come up to the

7    witness stand and have a seat.  Officer, please step

8    outside.

9              OFFICER SHAFER:  Yes, sir.

10             THE COURT:  And do not discuss your testimony

11   with anyone until after I've rendered a decision in the

12   case -- except the lawyers, of course.

13             (Whereupon, Officer Shafer departed the

14   courtroom, as requested.)

15             THE COURT SECURITY OFFICER:  Have a seat in

16   that chair.

17             MR. TORRES:  (Complied with the request.)

18

19

20

21

22

23

5

1    Whereupon,

2                            JOSE TORRES

3    a witness, was called for examination by counsel on behalf

4    of the Commonwealth, and, after previously having been

5    duly sworn by the Court, was examined, and testified as

6    follows:

7                        DIRECT EXAMINATION

8               BY MS. CORRIDON:

9         Q     Could you please introduce yourself to the

10   Court?

11        A     My name is Jose Torres.

12        Q     Okay.

13              Mr. Torres, on December 19th of 2017, were you

14   at Springfield Town Center?

15        A     Yes.

16        Q     On that date did you have occasion to purchase

17   a bracelet from Pandora?

18        A     Yes.

19        Q     Do you recall how much you paid for that

20   bracelet from Pandora?

21        A     Anywhere between two-seventy and two-ninety I

22   vaguely remember.

23              MR. HUNDLEY:  Judge, I -- I'm going to object

6

```
1    if he can't state the true value -- what he paid.

2               THE COURT:  You can cross examine him, Mr.

3    Hundley.

4               BY MS. CORRIDON:

5         Q     The bracelet was over $200?

6         A     Yes.

7         Q     Okay.

8               After you purchased this bracelet what did you

9    do next?

10        A     My siblings and I went downstairs.  There was

11   a playpen there.  And we were having a conversation.  I

12   misplaced the bag.  I put the bag down.  And -- I was

13   careless so I thought I grabbed the bag and took it with

14   me but I had left it behind.

15              And then once I had left I then noticed that I

16   didn't have the bag with me.  I went to go see if I can

17   retrieve it and it was no longer there.  Well, the bag

18   itself was found in the cubbies where they place the

19   shoes.

20              THE COURT:  I'm sorry, sir.  I didn't -- I

21   missed that last part.  You said the bag was there --

22              THE WITNESS:  The bag itself -- the Pandora

23   bag itself -- was there but there was nothing in the bag.
```

7

```
 1    It was -- I found it in the cubbies.

 2              BY MS. CORRIDON:

 3       Q    What was originally in the bag --

 4       A    There --

 5       Q    -- that you are describing?

 6       A    -- there -- there -- there was a box --

 7       Q    And what --

 8       A    -- in there.

 9       Q    And what was in that box?

10       A    The -- the bracelet.

11       Q    The bracelet that you had purchased.

12              Did you report this to anyone?

13       A    I went to -- oh, what was it called?  The --

14    the Help Center Desk.  It's not that far from the like

15    playpen.

16              And I asked if -- if someone could look into

17    that -- security -- mall security.  And I was told to

18    contact Fairfax County.

19       Q    Did you contact Fairfax County Police?

20       A    I did.

21              MS. CORRIDON:  Your Honor, I have no further

22    questions for this witness.

23              THE COURT:  Cross examine?
```

8

```
1                      CROSS EXAMINATION

2               BY MR. HUNDLEY:

3       Q       You said you bought this bracelet from a

4    Pandora store?

5       A       Yes, sir.  It's located upstairs --

6       Q       Okay.

7       A       -- from the playpen.  It's like -- it's

8    literally like right upstairs (indicating).

9       Q       And you can't recall exactly how much you paid

10   for the bracelet but you know it was definitely over $200?

11      A       Yes, sir.

12      Q       How did you pay for it?

13      A       With my debit card.

14      Q       And when you left the Pandora store where was

15   the bracelet?

16      A       With me.

17      Q       Was it in a box?

18      A       It was in a bag.

19      Q       And what was in the bag?

20      A       The box.

21      Q       Okay.

22              And what was in the box?

23      A       The bracelet.
```

9

```
 1        Q     The bracelet, okay.

 2              And what did the bag look like?

 3        A     It's like a small bag.

 4        Q     Okay.

 5              Did it have any --

 6        A     It had a ribbon on the top of it -- a pink

 7    ribbon.

 8        Q     Uh-huh.

 9              Did it have any markings on it?

10        A     The Pandora -- like the little --

11        Q     All right.

12        A     -- like (indiscernible).

13        Q     Was the receipt for the bracelet in the bag?

14        A     I -- I had it --

15        Q     You had the receipt?

16        A     I had the receipt.

17        Q     And the bag itself had no identification

18    identifying --

19        A     Right.

20        Q     -- you as the owner; is that true?

21        A     That's true.  There were --

22        Q     Right.

23        A     -- there -- there wasn't --
```

10

```
 1      Q      Nor the box, nor the bracelet?

 2      A      No, sir.

 3      Q      So anybody finding that bag would have no way

 4   of knowing it was your bracelet, right?

 5      A      (Nodding.)

 6      Q      Okay.

 7             You said you went -- you took the bag

 8   downstairs with you to the play area, correct?

 9      A      Yeah.  Well, I was near the play area.  I was

10   like by the -- by the cubbies --

11      Q      Okay.

12      A      -- by -- while my niece and nephew were

13   playing.

14      Q      And you said you put the bag down.

15             Do you know where you put the bag down?

16      A      Right next to me.

17      Q      But where was that?

18      A      I -- I placed it --

19      Q      Where physic -- on the ground?

20      A      Yes, sir, on the ground.

21      Q      Okay.

22      A      Like I stated, that was my fault.  I did -- I

23   was careless.  I placed the bag down and --
```

11

```
 1        Q      Okay.

 2        A      -- thought I had retrieved it.

 3        Q      And then how long was the bag on the ground?

 4        A      I was there for about an hour or so so --

 5        Q      And were you --

 6        A      -- it was right next to -- it was right next

 7   to me the (inaudible).

 8        Q      The whole time the bag was right next to you

 9   while you were at the play area for an hour?

10        A      Well, I -- I was near the play area.  I was by

11   the cubbies.

12        Q      Okay.

13               But was the bag with you --

14        A      Yeah --

15        Q      -- that entire time?

16        A      -- yes, sir.  It was always next to me, yes,

17   sir.

18        Q      And I take it you left the play area with your

19   niece and nephew and left the bag behind?

20        A      Left the bag behind.  I didn't --

21        Q      How long -- how long was --

22        A      -- didn't notice that.

23        Q      -- how long was the bag out of your possession
```

12

1    before you realized it was gone?

2         A     Twenty, thirty minutes.

3         Q     And at that point after that 20 or 30 minutes

4    that's when you went to the Help Desk?

5         A     That's when I went back to go make sure the --

6    whether like before I went to go to the Help Desk to see

7    if it was still there.

8         Q     Okay.

9         A     And I thought I had found it because I saw the

10   bag itself.  I said, "Oh, well, that's my luck.  Nice."

11        Q     Okay.

12              And --

13        A     "I can just grab this and go about my way."

14        Q     Had that bag been moved from where you had

15   left it?

16        A     Yeah.

17        Q     Okay.

18        A     It was in a cubby.  It was (inaudible).

19        Q     So how far had the bag been moved; do you

20   know?

21        A     Maybe just a few feet.

22        Q     Was it on the ground in front of the cubbies?

23        A     It was on the ground.

13

1     Q     It had been on the ground in front of the

2   cubbies?

3     A     On the ground, yes.

4     Q     Okay.

5           And you never saw anyone but yourself touch

6   that bag or go into that bag or remove anything from that

7   bag, right?

8     A     I mean, I showed it to my siblings.

9     Q     Okay.

10          But you have no idea how that bag became empty

11  after you walked away?

12    A     No, sir.

13          MR. HUNDLEY:  No further questions, Your

14  Honor.

15          THE COURT:  Any redirect, Ms. Corridon?

16          MS. CORRIDON:  No, Your Honor.

17          THE COURT:  All right.  You may step down.  Is

18  he subject to recall?

19          MS. CORRIDON:  No, Your Honor.

20          THE COURT:  All right.  You may stay or leave

21  as you please.  Just don't discuss your testimony with

22  anyone --

23          THE WITNESS:  Yes.

14

1          THE COURT:  -- until after I've rendered the

2     decision in the case.

3                                    (Witness stood down.)

4          THE COURT:  Call your next witness please, Ms.

5     Corridon.

6          MS. CORRIDON:  Officer Shafer.

7          THE COURT:  Officer Shafer.

8     Whereupon,

9               OFFICER SCOTT D. SHAFER

10    a witness, was called for examination by counsel on behalf

11    of the Commonwealth, and, after having previously been

12    duly sworn by the Court, was examined, and testified as

13    follows:

14         THE COURT:  Officer, please come up and have a

15    seat on the witness stand.  You are under oath.  Answer

16    questions put to you by the attorneys.

17         THE WITNESS:  Yes, Your Honor.

18              DIRECT EXAMINATION

19         BY MS. CORRIDON:

20     Q     Could you please introduce yourself to the

21    Court?

22     A     Sure.  Scott Shafer, police officer with

23    Fairfax County Police Department.

15

1      Q      How long have you been employed in that

2   capacity?

3      A      More than 11 years.

4      Q      And were you so employed on duty in uniform

5   and displaying your badge of authority on December 20th of

6   last year?

7      A      Yes, I was.

8      Q      On that date did you have an occasion to

9   investigate a larceny complaint from the Springfield Town

10  Center?

11     A      Yes, I did.

12     Q      Okay.

13            Who reported that to you?

14     A      Mr. Jose Torres.

15     Q      Okay.

16            What, if anything, did you do during the

17  course of your investigation?

18     A      Mr. Torres had reported to me that he had set

19  down a bracelet.

20            MR. HUNDLEY:  Objection to hearsay, Your

21  Honor.

22            THE COURT:  He's already testified to that.

23  He's just repeating what he did and what he would do in

16

1    response to it so I'll overrule the objection.  Go ahead.

2              THE WITNESS:  He'd been near the play area in

3    the Springfield Town Center which is located at the lower

4    level right below the Pandora store.

5              He stated he had left a bag.  I think it was

6    on the little cubbies where kids might leave their shoes

7    or other things when they went and played.

8              He walked away with it accidentally after

9    having said goodbye to his family.

10             Then he proceeded to leave it there and sat

11   there for approximately an hour and a half, hour and

12   forty-five minutes during which time there was actually a

13   couple that had been laying down on the ground near the

14   cubby areas and had witnessed it.

15             MR. HUNDLEY:  I'll object to the foundation,

16   Your Honor.

17             THE COURT:  Sustained.

18             BY MS. CORRIDON:

19        Q    Officer, what, if anything, did you use to

20   conduct your investigation?

21        A    Sure.  I conducted a -- went and met with mall

22   security.  They have a video surveillance system that has

23   a video camera that is actually directed directly at the

17

1    cubbies where the bag had been -- been set down.

2              So upon reviewing the video I was able to see

3    --

4              MR. HUNDLEY:  Your Honor, I'm going to object

5    to the officer's review of what's on the video -- a lack

6    of foundation, hearsay.  If there's a video we should see

7    the video.

8              THE COURT:  Well, the -- as to hearsay, I'm

9    not sure about that, but I do think you have to lay a

10   foundation, Ms. Corridon.

11             MS. CORRIDON:  Okay.

12             BY MS. CORRIDON:

13   Q    Officer, does the Springfield Town Center have

14   cameras?

15   A    Yes, it does.

16   Q    Where are they located?

17   A    Throughout the -- I think they have more than

18   a hundred cameras throughout the mall, parking garages,

19   parking lots, outside areas, inside areas, hallways.

20   Q    Are you familiar with how these cameras work?

21   A    Yes.

22   Q    How do they work?

23   A    They are -- they are closed circuit where they

18

1   record independently onto a computer system that's within

2   their secure facility within -- inside the mall.

3        Q    And closed circuit -- what do you mean by

4   that?

5        A    That means that there is no access from inside

6   or -- outside of the system.  So the system is self-

7   contained within a computer system inside -- so there's

8   not outside access from like the internet.

9        Q    Does anyone have the ability to tamper with

10  this system?

11       A    Not to my knowledge, no.

12       Q    Okay.

13            And is this system recording in real time?

14  Are you familiar with how it's recording?

15       A    It records in real -- in real time.  What it

16  is is actually it's a motion and heat sensitive system.

17  So cameras will not record unless there is motion that is

18  -- that is surrounding that particular camera.

19       Q    And was this camera to the best of your

20  knowledge on and working on December 19th?

21       A    Yes.

22       Q    Okay.

23            And did you have occasion to view this

19

1    footage?

2          A     Yes, I did.

3          Q     On what date did you review the footage?

4          A     I reviewed it on the 20th and 21st of

5    December.

6          Q     And where did you review this footage?

7          A     In the security office at Springfield Town

8    Center.

9          Q     Okay.

10               Had it been altered with or tampered in any

11   way?

12         A     Not to my knowledge.

13         Q     Okay.

14               And what did you observe on the video?

15         A     The -- I observed the --

16               MR. HUNDLEY:  Your Honor, again, I'm going to

17   object to him testifying to what he sees on the video.  If

18   there's a video we should see the video.

19               THE COURT:  Well, I'm not sure -- I don't

20   think so, Mr. Hundley.  You can certainly ask for -- I

21   imagine they will provide you with a copy of it if they --

22               MS. CORRIDON:  Your Honor, it has been

23   provided.

20

1            THE COURT:  All right.  But, no, I don't --

2            MR. HUNDLEY:  Well, I'm objecting to the

3     foundation for that nature and purpose --

4            THE COURT:  He can testify to what -- he can

5     testify to what he saw just as he could testify to what he

6     saw in any particular -- he's -- he's established the

7     basis for that.  Go ahead.

8            THE WITNESS:  So upon reviewing the video, the

9     bag had been set on top of the cubbies in between a kind

10    of a carpeted area and a play area.

11           And that -- for a period of time there was a

12    couple -- a man and a woman -- that had been in that area,

13    from what I believe, may have been using the internet --

14    the WiFi.

15           So -- the gentleman had been on a computer for

16    most of the time, probably a little over an hour's time.

17           At one point the woman then stands up,

18    actually picks up the bag and draws it to the attention of

19    the man that's down below, then gives that -- set the bag

20    down onto the cubby.

21           A few minutes pass by.  The gentleman then

22    goes back and picks up the bag and takes out the contents

23    of the bag, places the contents into the pocket of his

21

1    jacket and then proceeds to exit the mall out to a parking

2    garage and then drives away.

3                 BY MS. CORRIDON:

4         Q      Okay.

5                 Were you able to observe this individual's

6    face on the video?

7         A      Yes, I was.

8         Q      And the individual you are describing as the

9    man who picked up the contents of the bag, do you see him

10   in the courtroom today?

11        A      I do.  He's seated next to Counsel.

12               MR. HUNDLEY:  Your Honor, I'm going to object

13   to identification.  Again, if there's an identification

14   that's being made through a video we should see the video.

15   And the Court can look at the video and determine if, in

16   fact, it's the Defendant --

17               THE COURT:  Ms. Corridon?

18               MR. HUNDLEY:  -- that's on the video.

19               MS. CORRIDON:  Your Honor, I think it goes to

20   what he reviewed on the video.  He had personal knowledge

21   of it.  He's compared what he's seen on the video to what

22   he sees in the courtroom today.

23               THE COURT:  For purposes of today's hearing,

22

1    Mr. Hundley, I agree with her.  I overrule the objection.

2              MS. CORRIDON:  All right.

3              BY MS. CORRIDON:

4         Q    Do you see the individual on the video in the

5    courtroom today?

6         A    I do.  He's seated next to Counsel.

7              MS. CORRIDON:  Your Honor, I'd ask for

8    purposes of the recording, he identified the Defendant.

9              THE COURT:  Thank you.

10             BY MS. CORRIDON:

11        Q    Officer, is Springfield Town Center located

12   within the confines of Fairfax County?

13        A    Yes, it is.

14             MS. CORRIDON:  Your Honor, I have no further

15   questions for this witness.

16             THE COURT:  Cross examine, Mr. Hundley?

17                  CROSS EXAMINATION

18             BY MR. HUNDLEY:

19        Q    When you first began looking at the video,

20   Officer, you saw a bag sitting on top of the cubbies where

21   shoes and -- are you -- used to store shoes and other

22   items for the play area for the children?

23        A    The initial point where I started doing the

23

1    video was back when Mr. Torres had been holding his bag in

2    his possession and had set them down saying goodbye to

3    family.  And then I reviewed it past that.

4         Q    Okay.

5              And where did Mr. Torres set the bag down?

6         A    He had set it down on the cubby.

7         Q    On top of the cubby?

8         A    Yes, sir.

9         Q    So he didn't set it on the floor?

10        A    I don't recall the exact things -- where it

11   had been.  But it ended up at some point on top of the

12   cubby.

13        Q    Okay.

14             And you -- but you don't have any idea how it

15   got on top of the cubby?

16        A    I don't recall exactly.

17        Q    You didn't see anybody on the video putting

18   the bag on top of the cubby, did you?

19        A    I didn't take note of specifically how it got

20   there.

21        Q    Okay.

22             And in reviewing the video could you determine

23   where that bag had come from?

24

1          A      Initially, yeah.  I had determined that it had

2     come from Mr. Torres.  Like where -- oh, like what store

3     it had come from or where --

4          Q      Yeah.

5                 Could you tell on the video from the little

6     bag sitting on top of the cubby -- could you identify the

7     store it had come from?

8          A      It was consistent with Pandora but, no, I

9     could not say specifically what store it had come from.

10         Q      Okay.

11                And you didn't have any kind of cameras

12    looking inside of the bag, did you?

13         A      No, sir.

14         Q      Okay.

15                And so you couldn't see what was inside of the

16    bag at the time it was on top of the cubby?

17         A      But I could see what he took out of the bag

18    after he had picked it up --

19         Q      Okay.

20         A      -- from the top of the cubby.

21         Q      And what you say you saw is a box?

22         A      It appeared to be a box, yes.

23         Q      Okay.

25

1          But you have no idea what was in that box?

2      A     No, sir.

3      Q     Okay.

4          And it's your testimony that there was a woman

5   with Mr. Morton who actually picked up the bag the first

6   time and handed it to him?

7      A     Yes, that's correct.

8      Q     Okay.

9          Is there any video footage for that bag -- for

10   that -- for the -- is there any audio on the video?

11      A     No, sir.

12      Q     Okay.

13          So you had no idea what the woman said --

14      A     No, sir.

15      Q     -- to the man who put it in his -- to Mr.

16   Morton?

17      A     No, sir.

18      Q     Okay.

19          And you said you were then able to see them

20   leave the store and drive from the mall?

21      A     They left separately so Mr. Morton left from

22   one direction and the woman left in another direction.

23   They eventually met up a number of minutes later inside

26

1    the vehicle in the parking garage outside of the mall.

2         Q    All right.

3              And did you ever recover the bracelet?

4         A    Yes.

5         Q    Where was it recovered?

6         A    At the Pandora store.

7              MR. HUNDLEY:  Those are all the questions I'd

8    have --

9              THE COURT:  All right.

10             MR. HUNDLEY:  -- Your Honor.

11             THE COURT:  Any redirect, Ms. Corridon?

12             MS. CORRIDON:  No, Your Honor.

13             THE COURT:  All right.  You may step down,

14   Officer.

15                             (Witness stood down.)

16             THE COURT:  Does the Commonwealth have any

17   further witnesses?

18             MS. CORRIDON:  That's the Commonwealth's

19   evidence, Your Honor.

20             THE COURT:  All right.

21             MR. HUNDLEY:  Your Honor, I'd ask the Court to

22   -- to dismiss the case.  I don't believe that there's any

23   evidence that Mr. Morton took this bracelet with any

27

1    intent to deprive its owner of possession of it.

2            At best what we are dealing with here is lost

3    property.

4            Lost property can't be the subject of a

5    larceny unless the person finding it would know who the

6    owner was or had the means of learning who the owner is or

7    has reason to believe the owner may be discovered, and

8    then at that time takes the property -- the lost property

9    -- with the intent to convert it to themselves.

10           And that's *Hutchinson versus the Commonwealth*,

11   133 Va. 710.  It's a 1922 case, Judge.  It's a very old

12   case.

13           What we have here is the testimony of Mr.

14   Torres saying he left the bag on the ground for 20 or 30

15   minutes.  Officer Shafer says it was left unattended for

16   perhaps an hour and a half after reviewing the video.

17           THE COURT:  Uh-huh.

18           MR. HUNDLEY:  When Officer Shafer first sees

19   it it's not on the floor.  It's on top of the cubby.

20           THE COURT:  Right.

21           MR. HUNDLEY:  He sees purportedly Mr. Morton

22   being given the bag by a woman.  He then puts the bracelet

23   or the box -- we don't know what's in the box at this

1   point because we don't know who's had access to the bag or

2   the box or the bracelet during the interim period -- put

3   it in his pocket and leave.

4            And yet the bracelet is inexplicably recovered

5   at Pandora.

6            THE COURT:  Okay.

7            MR. HUNDLEY:  So somehow it was returned to

8   Pandora.

9            THE COURT:  All right.

10           MR. HUNDLEY:  I don't believe there's evidence

11  of a theft here, Your Honor.

12           THE COURT:  Thank you, Mr. Hundley.  Ms.

13  Corridon, do you want to respond?

14           MS. CORRIDON:  Your Honor, Mr. Torres'

15  testimony was that he paid over $200 for the bracelet --

16           THE COURT:  Value is not at issue.

17           MS. CORRIDON:  -- which was placed in the box

18  in the bag.  Officer Shafer testified that he sees the

19  Defendant go over, reach into the bag, remove the box.

20           THE COURT:  But I have to take it from the

21  testimony of Mr. Torres who said he left it on the ground.

22  The video -- the testimony of the officer was that when he

23  saw it in the video it was on top of the -- on top of the

1    cubby.

2              And he doesn't recall how it -- there's no

3    explanation as to how it got there.  Then we have the

4    sequence where it's -- the Defendant is seen to go -- meet

5    up with the female.

6              They have some kind of conversation and the

7    bag is put down.  There's no indication of whether

8    anything was taken at that point.  What hap -- and then

9    finally it ends up at the Pandora shop.

10             MS. CORRIDON:  Your Honor, I submit the case

11   on the Commonwealth's evidence.

12             THE COURT:  All right.  I have to agree with

13   Mr. Hundley on this one.  I'm going to order the charge

14   dismissed.  The Commonwealth can take any steps it feels

15   necessary.

16             MS. CORRIDON:  Thank you.

17             THE COURT:  Thank you.

18             MR. HUNDLEY:  Thank you, Your Honor.

19                       *  *  *  *  *

20             (Whereupon, at approximately 3:15 o'clock

21   p.m., the hearing in the above-entitled matter was

22   concluded.)

23

30

## CERTIFICATE OF REPORTER

I, GAIL HIRTE ZEHNER, a Verbatim Reporter, do hereby certify that I took the stenographic notes of the foregoing proceedings which I thereafter reduced to typewriting; that the foregoing is a true record of said proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which these proceedings were held; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

_____
GAIL HIRTE ZEHNER
Verbatim Reporter